# THE

# NEW YORK SUPPLEMENT

## VOLUME 127

(142 App. Div. 547.)

### SEAMAN et al. v. McLAURY et al.

(Supreme Court, Appellate Division, Second Department. January 31, 1911.)

WILLS (§ 324*)—UNDUE INFLUENCE—EVIDENCE.

    Evidence in an action to determine the validity of a will *held* insufficient to justify submission of the issue of undue influence.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. § 769; Dec. Dig. § 324.*]

    Hirschberg and Woodward, JJ., dissenting.

Appeal from Trial Term, Westchester County.

Action by Emma Seaman and others against Edward R. McLaury, executor of Jane Blauvelt, deceased, impleaded with others. From a judgment for plaintiffs, and from an order denying a motion for new trial, defendant McLaury appeals. Reversed, and new trial granted.

See, also, 136 App. Div. 890, 119 N. Y. Supp. 1144.

Argued before JENKS, P. J., and WOODWARD, HIRSCHBERG, THOMAS, and RICH, JJ.

James M. Hunt (John H. Corwin, on the brief), for appellant.
Lavinia Lally, for respondents.

THOMAS, J. The action is to determine the validity of the will of Jane Blauvelt, who, born in 1820, made her will on December 11, 1907, and died June 6, 1908. The plaintiffs, who, with the defendant Stewart, are nephews and nieces or children of the testatrix, allege that at the time of executing the will the testatrix—

"was not of sound mind or memory or mentally capable of making a will, and was an elderly, sick woman, and feeble mentally and physically; that the execution thereof, if the same was ever executed by said Jane Blauvelt, was secured by the fraud and undue influence of one Mary Adams, Mrs. George Rose, Frederick W. Cutler, pastor of said defendant, the First Reformed Church in Yonkers, their agents and servants, whereby the intent and purposes of said Jane Blauvelt in making a testamentary disposition of her property was overcome and destroyed, and the desires and purposes of" such persons "were substituted therefor."

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

    127 N.Y.S.—1

The allegations in effect are that the testatrix did not have testamentary capacity, but that she did have "intents and purposes, * * * in making a testamentary disposition of her property," which were thwarted by the fraud and undue influence of such persons. It is not necessary, although it admits of discussion, to review in its .entirety the evidence of testamentary capacity, as the submission of .that issue was accompanied with the question whether such ability, if existing, was perverted by undue influence.

The learned justice presiding at the trial, moved thereto it may be by the decision of this court upon the earlier appeal, where there was a different record, most fairly and with helpful explanation of the applicable law, submitted both questions to the jury; but it is considered that the present ·evidence is not sufficiently probative to justify the submission of the issue of undue influence. There is not discovered evidence that reasonably justifies an inference that the persons accused, individually or collectively, by word, act, or suggestion promoted the will or its actual making, except so far as their unselfish, gracious, and devoted visits, companionship, and Christian ministrations inspired the testatrix to the testamentary act. They had no knowledge of her property, or its amount. They refused to discuss with her the subject of will making or to aid such undertaking, but informed her that it was a matter that concerned her family. · Their whole attitude toward the..matter indicates the observance of every propriety, and is consistent with the errand of mercy that brought them to her bedside. In connection with a statement so unreserved should be considered the testimony of Mrs. Stewart, with whom she lived, and who was her relative and custodian, as to several conversations with Miss Adams, who, as a member of the King's Daughters connected with the church, made her frequent visits. Mrs. Stewart's testimony is to the effect that "Miss Adams asked her if she didn't think that Mrs. Blauvelt ought to make a will, and that she (Miss Adams) should talk to her about it"; and a second time Miss Adams asked whether she did not think she (Miss Adams) had "better talk to Mrs. Blauvelt"; and a third time Miss Adams said that Mrs. Blauvelt should make a will and leave some money to the church, and that she would talk to her about it. On each occasion Mrs. Stewart assented to Miss Adams talking to Mrs. Blauvelt, and in the two earlier conversations stated that she would not "get her to make a will," or "she never will make a will." Miss Adams contradicts this version, and in giving her own testified:

"I had frequent conversations with her [Mrs. Stewart]. She spoke to me about a will of Mrs. Blauvelt a week or two after Mrs. Blauvelt came back to Yonkers * * * the second time. I met Mrs. Stewart on the street, and we stood for a few moments, and she said to me, 'I think Aunt Jane is not looking very well.' I said, 'I think she looks very well.' She says, 'Yes, but she is failing very much,' and I said, 'Do you think it is true what she tells us about Mrs. Ackerman?' She said: 'It certainly is, Miss Adams. If you knew Ellen Jane Ackerman as well as I do, you would know it was true. I attended her mother's funeral, and she never asked me to break bread in her house.' 'Well,' I said, 'It is too bad;' and said, 'Aunt Jane never did believe in making a will; but I think, after the treatment Mrs. Ackerman has given her, that she ought to make a will.' That is what Mrs. Stewart said.

And I said I didn't blame her for feeling that way. 'Well,' she said, 'Miss Adams, if she ever speaks to you about making a will,' she said, 'why don't you take care of that?' I said, 'No, Mrs. Stewart; I don't think I have any right to interfere. I think that is a family affair.' To the best of my knowledge that is all that passed."

Mrs. Stewart on rebuttal did not deny this interview. But, if the plaintiffs be given the full benefit of Mrs. Stewart's narration, it appears that the accusation that Miss Adams unduly influenced Mrs. Blauvelt to will her property away from her relatives is sought to be sustained by this evidence that Miss Adams went to the very relative who had the proposed testatrix in charge and asked her opinion as to the propriety of Mrs. Blauvelt making a will, and received a reply that permitted Miss Adams to talk with the testatrix on the subject, with the added assurance that such conversation would be ineffective. This showed confidence in Miss Adams, or a settled conviction that the testatrix was so mentally strong that her determination not to make a will could not be disturbed. Miss Adams is, by Mrs. Stewart's testimony, exhibited as contemplating fraudulent importunity, and consulting one of the very persons claimed to have been wronged, and receiving from her license to employ her influence to that end, with positive assurance of an unsuccessful issue. That testimony, whatever credit or significance be given to it, is in itself, or in connection with any other evidence in the case, entirely insufficient to support the verdict. But notice the sequence. When the time came for making the will, there were two persons only who brought to the testatrix the persons who drew and witnessed it, namely, Mrs. Blauvelt and Mrs. Stewart—the former the disposing party, and the other her niece, who had her in her care. Mrs. Stewart testified that she first learned from a neighbor that her aunt, Mrs. Blauvelt, had made a will, and she added:

"I remember the night when Mr. Corwin came to the house with these two gentlemen. I went into the parlor with them. I took them upstairs. Corwin had a paper in his hand. I never saw the gentleman before. He says, 'I have some writings.' I said, 'I don't know anything about it.' And so I went in and lit the gas in my aunt's room. She could never have a light on account of her eyes. Then I came out and said, 'You may go in and see her.' "

And at his request she got him some ink. On cross-examination she testified:

"I called at the door of Mr. Corwin's house. As near as I can remember, I went there in the morning to Mr. Corwin's house, and he came that same evening to my house. I am positive, as near as I can think. * * * I cannot say positively. Yes; I left word, on the occasion when I called at Mr. Corwin's house, for him to call at my house to see Mrs. Blauvelt."

This evidence must be considered in connection with the testimony of Mr. Corwin, which Mrs. Stewart, although recalled, did not contradict. He said that he went to Mrs. Stewart's house—

"in pursuance of a message which I received to go and draw a will for Jane Blauvelt. I received it at my house the night before, on the 10th of December, from my eldest daughter. * * * I did go in response to that message the following evening. I requested George Offerman and Dr. Holden, * * * on the stand, to go with me. * * * We went directly to 22 Ra-

vine avenue, and there first saw Mrs. Stewart, whom I told that I understood that she had been to my house to get me to come and make a will for her aunt, Mrs. Blauvelt. She said she did. I had a further talk with her. When she admitted us to the parlor, I asked her whether she expected to be remembered in the will, and she said that she did, and I told her under the circumstances I always advised persons not to be present who were to be included in the will, so that it could not be said there was any undue influence. I advised her not to be in the room, and she said, 'I don't want to have anything to do with it.' When I reached the house that night, I did not know Mrs. Stewart. I introduced myself, and explained to her that I was Mr. Corwin, and that I understood that she had sent for me. She took me into Mrs. Blauvelt's room. I think she lit the light. The upper part of the house was dark. Before going into the room where Mrs. Blauvelt was, I introduced Dr. Holden and Mr. Offerman to Mrs. Stewart by name, and told her I had brought them because I understood that the lady for whom I was to draw the will was a blind woman, and that I was unwilling to take instructions from any blind woman, unless I had witnesses of my own selection with me, to hear the instructions. Thereafter Mrs. Stewart took me in and presented me to Mrs. Blauvelt. She introduced me, and stated to her the purpose of my visit. She told her in general that this was Mr. Corwin, who had come to draw her will. I introduced Dr. Holden and Mr. Offerman to Mrs. Blauvelt."

Dr. George P. Holden, a physician residing at Yonkers, gave the following version:

"When we first got into the house, we saw Mrs. Stewart at the door at the second floor on the stoop. Mr. Corwin told Mrs. Stewart that we had come to draw up Mrs. Blauvelt's will. Mrs. Stewart stepped into the parlor or front room, and Mr. Corwin asked Mrs. Stewart pretty nearly the first thing if she expected to be remembered in the will. And she said she naturally did; and Mr. Corwin said, 'I think it would be advisable for you to stay out of the room.' And then she took us into the room where Mrs. Blauvelt was. I think she lighted the gas as we went in. Mrs. Stewart introduced all three of us in a general way to Mrs. Blauvelt, and said Mr. Corwin had come to draw the will. Mrs. Blauvelt was lying in bed. Mr. Corwin reported that we had come to draw the will before Mrs. Stewart left the room."

It is further to be noticed that, as appears from the evidence of Mr. Corwin and Mrs. Rose, Mrs. Rose mentioned to Mr. Corwin, at some time before the will was drawn, that some lady, perhaps giving Mrs. Blauvelt's name, was likely to send for him to draw her will. As to this, Mrs. Rose testified:

"The first time I called upon her, after I returned and after she returned to Yonkers, she told me she wished to make a will, and asked me if I knew a lawyer, and I told her, 'Mr. Corwin,' and she wanted to know if he was a good man, and I said, 'He ought to be; he is an elder in our church.' And she asked me if I would speak to Mr. Corwin to come to her to make a will. I told her, 'No; it was none of my affairs;' that she should speak to some member of her family, and they would do that for her."

On cross-examination Mrs. Rose gave the following testimony:

"I called at Mr. Corwin's, as I frequently did, on his daughter and his wife, and Mr. Corwin came into the room, and I told him. So far as I remember the circumstances, I called there to see his eldest daughter. I don't remember whether Mrs. Corwin was in the room at the time or not. Mr. Corwin came in from an adjoining room, and I told him—I don't remember that I even told him the name—that I had told some one, that I had mentioned him as a lawyer when she asked me. * * * I am not positive whether I said the name or not."

It appears from her evidence in the Surrogate's Court that she did give the name. It is undoubted from the evidence that Mrs. Blauvelt

did, after her return to Mrs. Stewart's, frequently mention to Miss Adams and Mrs. Rose the matter of making a will, and that these ladies declined absolutely to take any part or give any advice respecting it, and that they did not interfere with the matter; for it can hardly be claimed that giving to the inquiring sick woman the name of a lawyer, and mentioning to him thereafter that she had so given his name, constitutes proof of undue influence. Mrs. Stewart was the immediate, active, efficient agent, pursuant to Mrs. Blauvelt's request, in bringing Mr. Corwin to her house for the purpose of drawing the will. It should not be inferred from this that the will was of Mrs. Stewart's contriving, or that through her own inclination and for her own purposes she aided or abetted in its execution. But in determining who furthered the wish of Mrs. Blauvelt to make the will, and who, willingly or otherwise, concerted with her in finding means to do so, the evidence points unerringly to Mrs. Stewart, and not to any of the persons charged by the plaintiffs.

Mr. Corwin, as appears by his own evidence and that of Dr. Holden and Mrs. Offerman, conducted himself with an honorable regard for his profession. He found that the testatrix was a woman bedridden, very defective in sight, enfeebled by age, and he used circumspection, caution, and inquiry, and made such suggestions as the occasion demanded. When he found that she contemplated leaving all her property to the church, he sought for the reasons that induced the exclusion of her relatives. The testatrix exhibited an intention and purpose which, if she was mentally capable, she had a right to have; but nevertheless she so far modified them as to give to Mrs. Stewart a legacy which approximates her distributive share of Mrs. Blauvelt's estate, so far as the will indicates it. The evidence given by Mr. Corwin and the witnesses shows no attempt to coerce or misguide her, or that they attempted to further any scheme in that regard, and, moreover, indicates a testamentary capacity that the law would respect.

Something concerning her condition may be noticed, as it bears upon the ease or difficulty of importuning her successfully. Up to August 1, 1904, Mrs. Blauvelt lived alone at Tappan. Her age had brought serious physical infirmities. In July, 1904, she wrote to her nieces, Mrs. Stewart and Mrs. Ackerman, a letter revealing physical and mental suffering, wherein she asks them "to take me to board with you, if you will take me, and you will be rewarded for it." Pursuant thereto she made her home with Mrs. Stewart at Yonkers until November, 1905, when she changed her residence to that of her niece, Mrs. Ackerman, in Westwood, N. J. At this time the plaintiffs by their brief advise the court of a condition that indicates testamentary capacity. Mrs. Ackerman had charge of Mrs. Blauvelt's property; but she was burdened with the care of her mother, and on September 21, 1907, Mrs. Blauvelt returned to Mrs. Stewart's house, at and following which there was unmistakable increase of her helplessness.

Given this state of health, the opportunity to influence, and a will that carried largely her property from her kin, especially Mrs. Stewart, Mrs. Ackerman, and Mrs. Seaman, whose attentions and care, involving offices burdensome and often offensive, yet this does not show

that the defendants by fraud and undue influence brought about the result, even though the legacy seem disproportioned to what would be expected from mere social and religious intercourse. Persons disseminating mercies may not be presumed to have so misconducted, even if their compassion did induce the recipient to extravagant reward. Misinterpretation of attentions intended to be kindly and helpful, and an unjust ascription of sinister or malign motives, cannot be substituted for proof of wrongdoing; otherwise, works of mercy could not escape accusation.

It cannot be known from the present record what would have been the verdict of the jury on the issue of testamentary capacity, dissociated from that of undue influence; for the two questions have been blended, so as to confuse and misdirect inquiry and ascertainment. A consideration of the weight of evidence on the issue of testamentary capacity should await a verdict uninfluenced by a colorable attempt to establish undue influence.

The judgment and order should be reversed, and a new trial granted; costs to abide the event.

JENKS, P. J., and RICH, J., concur. HIRSCHBERG and WOODWARD, JJ., dissent.